Matter No. 181214 Ambac Assurance Corporation et al. v. Commonwealth of Puerto Rico et al. Ms. Miller, good morning. Good morning, Your Honor. The Cater-Miller Building Suite has been employed on behalf of Ambac Assurance Corporation. I'd like to, with the court's permission, reserve five minutes for rebuttal. You may. May it please the court. The key question in this appeal is whether Commonwealth law matters. We believe that it does. The Oversight Board, however, argues that the moratorium law and related executive orders are irrelevant because Ambac's rights are being affected by PROMESA rather than Commonwealth law. This is wrong for at least two reasons. First, the application of special revenues is not paid by PROMESA, and therefore bondholders or insurers of special revenue bonds are free to pursue their state court rights. And second, multiple tests under PROMESA, including the best interest of creditors test applicable to confirmation under Section 314, require the PROMESA court to refer back to and to consider and determine Commonwealth law in evaluating creditors' relative rights under PROMESA itself. The governor clearly agrees with us, as he just last week extended the moratorium orders, which we challenge on this appeal. So help me here. Suppose PROMESA had not been enacted. Then wouldn't you be in either Commonwealth court or if there was some jurisdictional basis, the U.S. District Court of Puerto Rico, seeking various forms of relief for the nonpayment and diversion of your funds? We brought a number of substantially the same claims in the District Court of Puerto Rico before the enactment of PROMESA. So PROMESA then gets passed, so that creates a problem for you because it grabs its hands around the whole thing. Even worse, then PROMESA then has a Section 305, which, as I read it, seems to say that the court can't give you any of the relief that you were looking for in the state court proceedings. But it does have a clause that says the court can give you relief from the stay, and we issued an opinion last summer saying that 305 does not bar the court from giving that. So this whole case puzzles me, because I'm wondering why you're not simply asking the court for relief from stay, and if you get it, then you do what you would have wanted to do but for PROMESA, although you'll have to contend with the fiscal plan issue and then you maybe have an extra sword you didn't have before because of PROMESA's prohibition of moratorium. So you'll still deal with it some, but you'll deal with it in that other tribunal. And if the PROMESA court doesn't give you relief from stay or doesn't agree with you that 922 and 922 or 928 avoid the relief from stay, then you appeal to us for the denial of the relief from stay. I'm not understanding why that isn't the sensible way to make sense out of this whole thing, and instead we've got all these free-floating legal issues about takings that don't seem to tack on to any relief you could actually get from the Title III court. Well, I think so I would say two things. The first is with respect to relief for which we would actually need relief from stay, as you mentioned, our position is that 922 accepts any action related to the application of the special revenues from the stay, and therefore we're asking for a decreditory judgment that we're not subject to the automatic stay so that we can pursue our state law remedies in any other case. You think 922 and 922-8 mean the stay doesn't apply, but you're not so darn sure of that that you're going to go out and file it and find out you were wrong and violated the stay so you'd like a judgment beforehand. Right. I mean, the consequences of violating a stay are significant, and so that's a risk, particularly in a court where we're in a contingency and that we prefer not to take it. But if you got relief from the stay anyhow, that would move that question. Correct. And the second portion, though, is there's a premise to your question, which we disagree with and is not disputed. In fact, the district court agreed with us on this, which is that Section 305 does not bar challenges to constitutional-based challenges. And so to the extent that what we're seeking is an injunction or a declaration that a particular statute is unlawful because it's unconstitutional, that the court is not barred or prohibited by Section 305. That was a ruling that was handed down by the district court and positions taken by the party in advance of our decision in PREPA. Right. And the decision, I mean, this court's decision in PREPA didn't address the question of the interplay between Section 305 and constitutional claims. Right. That's what the circuit did in the city of Detroit, didn't it? And didn't they say that it applies not just to injunctive but declaratory relief as well? So we're not disputing that it would apply to declaratory relief. The distinction that we're drawing here is whether it's a constitutional-based challenge and whether due process rights require that federal constitutional claims continue to be allowed to be adjudicated despite an apparent bar on judicial review or jurisdiction. And then I'm having trouble. How would you pose up as right a contract and certainly takings claim if you had not yet pursued available remedies in state court pursuant to relief from stay to have the orders declared unlawful under PROMESA and under the contract and to enforce your contract? Isn't a takings clause under those scenarios premature and unright? So it's not because everything works in concert together. And that's exactly why, you know, I would say the key issue on this appeal is preemption, which we would similarly say is not barred by Section 305 because much like having, much like this court decided in PIA when it ruled that it would be irrational to bar under 305 the right to give a remedy that a different provision of the statute expectly contemplates, the same would apply to 303 preemption. What do you do when you get a free-floating declaration, the orders are preempted? Well, what that helps us with is that the orders stay and preclude our ability to pursue our state law and our state law remedies. So right now, even if we got a declaration saying that we're not subject to the automatic stay because these are special revenues and 922A accepts them, we still have the problem that the moratorium orders say that any claim related to HTA, bonds, payment obligations, or the executive orders are themselves stayed. And you would ask, therefore, for both a declaration and an injunction in that state court proceeding? Well, much like violating the automatic stay provisions in bankruptcy terms, the Moratorium Act outlines quite extreme, including punitive damages and other sanctions that could be brought against the party for purporting to, quote, knowingly violate the stay that's enacted in the executive orders. And so what we do then need from this court is an order declaring that moratorium laws and executive orders preempted under Section 303.1 and or 303.3, and then a declaration stating that we're not subject to the automatic stay with respect to actions to enforce the application of the special revenues to our bonds. And then we would be able to pursue remedies in an alternative form consistent with this court's decision and process. But we're being boxed in, and the problem right now is that we're subject to two overlapping and competing regimes which are somewhat coextensive, but also, you know, if you think about the Venn diagram, there's a lot of space that each one is covering that's not actually coextensive with the other. And so you have this stay under the moratorium order, which doesn't recognize this exception for motions to enforce the application of special revenues. Counsel, how do you characterize the district court's opinion? What I mean by that is the district court seemed to take your claims one by one and address them on the merits. I'm talking about the preemption claim, the 922, 928 claim, the contract claim, the takings claim. It did not seem to rely primarily on any jurisdictional limits to what it could address. Is that your primary take on the district court's opinion? Yes. So she dismissed some claims on jurisdictional grounds, but really the takings claim based on license and then 106E, claims related to the fiscal plan under 106E, which I'd like to get to later. But she otherwise figured that- But can you still say she thought you were challenging the certification process? There she did rely on a provision which says that you can't challenge that. But apart from that, she sort of took your theories face on and addressed them on the merits. Is that a fair characterization? Yes. And what's interesting is that she actually, at the same time, there were three cases concurrently before her. Our case, the Assure case, which this court heard almost two months ago now, also related to 922 and 928 and the application of special revenues. And the third one was the general obligation bondholder's challenge of the use of clawed-back money. And in that decision, the court relied quite heavily on Section 305. Issuing decisions at the same time, our decision is not grounded in 305. Because the court concluded in her decision that constitutional challenges were not part of Section 305. I don't recall much briefing at all on the argument that 305 is inapplicable to constitutional challenges. No one disputed it. Is there any authority for that proposition? Knowing the way these arguments also go, I'm willing to bet at least 50 cents on the money here. There is some dispute on this issue. Well, I'm sure now that you've briefed them, it might even be Mr. Hinn's source point. But the answer is that my recollection is that it was briefed for a while, that the citation, but during the break I'll try to pull an appropriate cite for that proposition, that Section 305 cannot constitutionally bar unless it so expressly states that it is precluding review of even constitutional claims or review of federal constitutional challenges. Unless the court has other overarching questions, I did want to, as Judge Green did, take the issues one by one and walk through what the core issues are. That would be helpful. Thank you. I want to start with preemption because, as I indicated in response to Judge Gabbard's question, it really is the key driving force that in some ways may actually allow the court to avoid a lot of the constitutional issues because if the moratorium laws and executive orders are granted, then there's a reset of our rights under Commonwealth law to what they were before those orders, and we could then go to state court and enforce those rights, including what we've come to say they're under. Section 303 under PROMESA is modeled clearly after Section 903 of the Bankruptcy Code, but Congress made two critical changes in enacting Section 303. The first is that Section 303.1 includes a preemption not only of restructuring laws, but also of moratorium laws, which merely delay payment. And second, it added Section 303.3, which preempts unlawful executive orders that modify bondholder rights or that divert funds from one debtor to another. The addition of moratorium laws to Section 303.1, we believe, was quite intentional, and it was added with full regard and awareness of the reality at the time, which was when PROMESA was being debated in Congress, Puerto Rico had already enacted a moratorium law, predating the moratorium law with certain executive orders, which rejiggers the payment structure. And so under common statutory interpretation of that method, also we believe what was clearly congressional intent is you need to actually give meaning to the inclusion of moratorium law in Section 303.1. And we would respectfully submit that that's what the courts did not do. So the court starts out by explaining that a moratorium law is one that may temporarily halt payment. Explain that. That's sort of self-evident, I guess, but the language that seems to be at issue here is that that moratorium, which implies a delay, does not have any lasting permanent effects that cannot be undone by subsequent proceedings. Hence, the important language does not bind any creditor. That seemed to be the language that was very important to the district court, suggesting that the way this is written, that there is the possibility of future relief for the creditor. And so the preemption concerns do not account for that language. So with due respect, I'd give two answers. One is that if a moratorium law is one that has to be binding such that it has permanent effect, then it is a compromise of indebtedness. And so applying a definition of permanent to a moratorium law, in our view, would transform it into a bankruptcy or restructuring law to say, I'm not going to pay you now and I'll never pay you. That's what a bankruptcy law is. And so it can't be that in especially adding a moratorium law that can't be binding on creditors, it can't be that the intention was just to make it self-referential back to a bankruptcy law. That's the first answer. My second answer is that that assumption, that analysis, goes to what we believe is a mischaracterization or misunderstanding both by the court and by the appellees about what we're claiming here. And so there's no suggestion that the only – we haven't been paid. We paid out $120 million in claims and said, yes, we're not happy that we're not getting paid. But fundamental to the nature of revenue bonds is that there is security and collateral backing it, and that fundamentally modifies the risk profile that people agreed to when they entered into a transaction. And what we're not getting now because of the moratorium and the failure to make payment and the failure to transfer revenues into the reserve account is it's changing the risk profile and it's taking our property in the sense of decreasing the collateral that we have. So if I can make that concrete, the first executive order that was issued in 2015 didn't actually trigger a payment default even though it allowed payments not to be made. Why? Because prior to that, money had been deposited into the debt reserve account and the debt payment account. That money was sufficient to, even when things went bad and the Commonwealth stopped making payments, allow bondholders to continue getting paid for almost a year. It's that buffer of security that's part of the deal, that's part of our property. Those are our pledged revenues, and that's what we're losing. That is permanent. The minute you take that dollar today, send it to the Commonwealth account and spend it, you've taken my collateral and that's not something I'm going to get back. And so it's not true that the moratorium act and the executive orders are not true permanent moratoria. Did the moratoria just stop the inflow of the funds into the segregated account or did it actually also remove funds from the segregated account? I didn't think it could do the latter. So it's an interesting historical debate that I actually believe goes to a change of capital in the Commonwealth and a change in perspective. The very first moratorium act made it quite clear that no money could be taken from the trust account and that that money could continue to get paid. The subsequent moratorium act actually said that, and the Commonwealth gave direction to the trustee not to make payments in that account, and we debated below, although we haven't pressed the issue on appeal, whether or not the money in that account is the property of the bondholders or not. So is there still money in the account? There was some reference to $69 million in there, but is there some money substantial that has not yet been applied to the debt? Yes. And that's because the trustee is obeying the order of the governor? Exactly. So in addition to that, there's also money haven't been flowing into the account, and if you look at this court's decision in the Father Jimenez case, the court made clear that a deviation, a diversion of money that is supposed to go into a reserve account is a taking of that property, and so it's not, you know, they could be taking the property by either taking it out of the account or by simply not depositing money that has been fudged to bondholders that should be flowing into that account. Okay. Counselor, there is a, just listening to the argument, just kind of striking parallelism between the preemption arguments you're making now and the more formal constitutional taking argument that you're making. They both raise issues of finality. I mean, they, to some extent, they argue that you're really making a breach of contract argument, which classically is not treated as a taking. How do you respond to that? There are a number of cases. I mean, what I refer to in my mind is the trilogy of JUA cases, but the Suarez-Galarza, Garcia-Rivera v. Calderon, and the Harvard-Hewman cases, those are all actually substantially similar to what happens here, right? Money is supposed to be, when fudged, is supposed to be flowing into an account, and the money, the commonwealth diverts it because they need it for other purposes. So they breach their contract. Well, those are all taking cases, and in those cases, the court didn't suggest that the proper analysis was a contract and a claims analysis. There are certainly pieces of the release that we're seeking, which is a contract. So what I would consider to be the reprioritization, the failure to preserve our last dollars, promises, those are properly contract claims, but the taking of the collateral that was pledged and leaned to creditors is a taking of property, and it's a taking of claims properly stated. And, you know, with respect to likeness, the court relied entirely on the Williamson County decision and the likeness factor set forth therein without at all recognizing or addressing that this is a facial-taking claim that's been asserted. And if there was no question, just like the court stated in the Aquatic Human Act, in deciding that that taking claim actually became life and accrued and was therefore barred by statute of limitations, that there was no doubt that when the Moratorium Act and executive orders were passed and signed into law, that the monies would not flow into our account. And we're not questioning or challenging. And there was no doubt that it would be applied to our assets. It specifically addressed all of the HTA revenues and not the collateral. And so those facial takings to which the Williamson County prompts don't apply. Counsel, money is fungible. And I assume at the confirmation stage, you will be there arguing that you should be made whole. Now, you may dismiss that as an unlikely possibility, but you will be making an argument to that effect. And the extent to which you may be made whole or partially whole or magnitudinally whole, I mean, that remains to be determined. Isn't that so? What I think that doesn't take into account is the fact that whether or not, yes, I will be standing at confirmation arguing that. But whether or not I subsequently will be given value doesn't mean that there isn't a taking now. And I'm not asking for determination or granting of just compensation now. What I'm asking for is that consistent with the AFTEL and other cases in the Supreme Court and the circuit that I be given injunctive relief now. Counsel, why doesn't that, what you're saying, take you back to Judge Kayada's original question that you should be, for all the reasons you're citing, you should be asking for relief from the stay? I mean, you had that, that approach was available to you, and you haven't pursued that. Well, I am asking for a declaration that I'm not subject to the stay, and if this court believes that it can't decide these constitutional issues now, I'll press them below. You know, in another court, which, because of the jurisdictional provisions of PROMESA, will probably be the District Court of Puerto Rico. So, anyway, there's no question of whether or not there's a taking. There's no precedent for the proposition that a taking claim that I have today has to be decided as part of the confirmation. And the city of Detroit is the only decision that addresses a taking, how to deal with a taking claim separate and apart from an allegation like, say, through the Security Industrial Bank where the taking alleged is actually caused by the restructuring law, so here it would be PROMESA. But you have a separate taking under separate laws, and in the city of Detroit case, those cases were adjudicated in separate proceedings. And the only question in the confirmation stage was not, was how do I deal with those job compensation judgments, and can they be impaired or discharged? I'm sorry that I have to stop you at this point, but I take it you are not arguing that there has been a final disposition of the revenues? Well, our view is that there's been a final discrimination under state law because it's under the Wilmington County test because it's unavailable, which Wilmington County viewed as an exception because it's a state under the MARA Climax. We have no access to other courts. So there's no proceeding in the future where you could claim these funds? Right. I'm hoping that I'll get an oath in this court to claim those preempted. Assuming that doesn't happen. I would have to read that as part of the claims contract and the bankruptcy clause. I think you're saying basically on this whole issue that there's a difference between a burden in the hand and a letter that says the check is in the mail. Right. And you're saying you have a burden in the hand in the form of security that should be applied from the trustee's fund and should replenish the trust fund. And instead, what you're getting is a hope that three years from now, the plan will feasibly be able to put a new stream of income in place that will have to be a larger stream to make up for the passage of time. Right. Well, I thought I wouldn't be very happy if I called them up today and said, if I'm down in my house, sit down and wait. I'll pay you in 30 years. I promise I will. It's a fundamentally different right and different property interest. And there's no authority for the suggestion that a federal bankruptcy procedure is an appropriate or necessary form for determining an allegation that a state law affects the same thing. So with that, thank you. Thank you. Mr. Beanstock. Good morning. Good morning. Martin Beanstock of Crossgaller Rose, attorneys for HTA and the Commonwealth as Title III debtors and for itself. May I please report? I would like to start with about three or four minutes of critical facts and legal principles. We believe our whole leader very significantly dispositive of the issues on appeal. And then I will dive into the more technical and intricate questions. From the moment Congress enacted PROMESA on June 30, 2016, it imposed an automatic stay against creditors in PROMESA Section 405B, precisely to protect the Commonwealth and its instrumentalities like HTA if they did not pay their debts. That stay was extended and ultimately expired on May 1, 2017, but was replaced by the automatic stay imposed by Bankruptcy Code Section 362A when the Commonwealth and HTA commenced their Title III cases on May 3 and May 21, 2017. Nevertheless, we are here because AMBAC claims the Commonwealth and HTA's failure to pay the debts Congress protected them from paying is constitutionally and statutorily barred. The Commonwealth owes, among other debt, more than $18 billion to bondholders that long ago promised to pay all that debt, but it has more recently determined to default due to the fiscal emergency declared by the U.S. Congress in Section 405M of PROMESA. When the Commonwealth, like any other debtor, determined to default, its broken promise to its bondholders immediately impaired their contractual obligations, but no one claimed the U.S. Constitution's Contracts Clause barred the default, even though the broken promise, if not broken, would put money directly in the hands of the Commonwealth bondholders. Another obligation, which is central to this morning, was the Commonwealth's obligation and promise that it had by statute to take certain license fees and gas and oil taxes and to appropriate or gift them to HTA to help HTA pay its expenses generally, including the bondholder debt service. We are here because AMBAC contends the Commonwealth's intentional breach of that promise to appropriate money to HTA is somehow special. Indeed, AMBAC claims PROMESA and the U.S. Constitution bar the Commonwealth from breaching that promise to pay. AMBAC can only make that claim by implicitly asking this Court to ignore the most obvious fact of all, namely that the Commonwealth is a Title III debtor. As a Title III debtor, the Commonwealth is supposed to breach its promises to pay money in the name of the Equality Policy so that all creditors of equal rank share the harm regularly. What do you do about 922D, for example? I understand that there are actual funds, special revenue funds, that the Commonwealth stopped applying to the debt. That's correct. And the automatic stay doesn't apply to their application to the debt. Your Honor said it absolutely correctly. The automatic stay does not apply to the application so that if the money that was already in HTA in the bond account, if HTA wanted to pay that money to the bondholders, it could not withstand any automatic stay. But there is no language in Sections 922 or 928 whatsoever that eliminates the other prongs of the automatic stay and that always compels a turnover of funds to bondholders. Counsel, I think they argue that there are other provisions that would have given your client the authority to apply these revenues to payments to the bondholders if it chooses to do so, so that given those other provisions, you are essentially saying that these provisions, 922 and 928, are superfluous. How do you respond to that? Well, first of all, the money that's in the so-called bond account is a relatively small amount of money in the context, and whether that gets turned over to the bondholders or not has very little significance to the case. What they're really arguing about this morning is not that. And one of the last things Amdach said this morning, there was a reference to the fact that the monies is their property, and I want to correct that because that's critical to this argument. The Commonwealth raises taxes, gas taxes, oil taxes, license fees. The Commonwealth historically would take a portion of those taxes, transfer it to HTA. Upon the transfer, some of that money gets put into bond accounts and becomes their collateral. But the statutory obligation of the Commonwealth to appropriate money to HTA, just like it appropriates money to all elements of government, is unsecured. It's the Commonwealth's property in the first place. It's not subject to sections 922 and 928. What Amdach is arguing about is that the total revenues, which is a portion of their collateral, now being used to sustain the transportation system, to get additional monies to pay their debt service, they're not in HTA in the first place. So 922 and 928 doesn't help them. So are you saying that HTA's own revenues that come from tolls, for example, and other fees that it may charge, are inadequate to even cover the indisputable operating costs of HTA? No. I think they are covering them. No. Is there any excess left over? Because one of their claims is those are special revenues pledged by HTA, and they're HTA's own fees coming in, and a portion of those is supposed to go to the bondholders or into the trust account. Right. And then that's further supplemented by a promise from the Commonwealth that it will provide additional funds to HTA. And the argument you're making, as I understand it, applies to that undertaking by the Commonwealth to supplement HTA's funds. But what about HTA's own excess funds over operating expenses? Why aren't those going to the bondholders? Your Honor, I'm not in a position to say there are excess expenses over operating expenses. I don't think there are, at least in any material amount, but I don't know that for an absolute fact. That's not in this record. If there are, then why wouldn't those go to the bondholders, but for the moratorium and the fiscal plan? Okay. If operating expenses were paid and money were just mounting up, we would probably have no problem turning over an excess to bondholders. That's what my understanding is. We're just barely covering our operating expenses. But I also want to correct something. I don't want my silence to be acceptance. The moratorium, and I'll get into whether there really is one or not, has nothing to do with why they're not being paid. They have never gone to court and asked for money, which they're doing right here. They're asking under 922 for money. They've never gone to court and had the Commonwealth or the Oversight Board turn around to them and say, because of the moratorium and the stay in the moratorium, you can't do this. Section 303.1 says that if there is a moratorium law, it's not binding against a non-consenting creditor. It's self-effectuating. They have never been turned down anywhere because of any moratorium law. They're not getting their money because of the automatic stay in the Title III case. And if all of those laws went away, and I'll get to why they existed in a few minutes, but if all of those laws went away, they still wouldn't be paid and they wouldn't have a right to be paid. Counsel, I'm not sure I understood something that you said. You were talking about 922. There's language there that talks about the application of pledged special revenues. Are you saying that the funds that were described in the various resolutions that permitted the authority to issue bonds and described how certain funds would be made available to secure payment on those bonds, those do not meet the definition of pledged special revenues? Is that your position? No, we haven't taken that position yet. What we've said in various proceedings is there are steps on the way to the funds becoming collateral. The taxes raised by the Commonwealth are Commonwealth property unencumbered. None of it becomes collateral until after it's transferred into HTA, and then it's not necessarily immediate because it goes through several accounts. Some of it ultimately becomes collateral. Okay, so when it becomes collateral, are you saying those are then pledged special revenues? We haven't said they're not, and we're not saying it now. Right now it's academic. I thought you were arguing that Section 922 is simply not available to them. It's not applicable to them. They can't invoke it to say that there is this exception to the stay. They can't invoke it to say your client was obligated to continue to make payments on the bonds because that phrase, pledged special revenues, is not applicable. It's not available to them to work. Thank you for raising it. Let me clarify. What we're saying is, number one, on 922, it gives HTA permission to apply pledged special revenues to the debt. So the money that's in the so-called trust fund account, whatever, there's nothing that prevents HTA from transferring that to AMBAC, but we're talking about small dollars. What they really want is for the Commonwealth to restart appropriating money that it raises through these other taxes to HTA. They're not appropriated today. They're paying for the teachers, the firemen, the police, and other things. So 922 doesn't help them. 922 only helps them after money gets into HTA. But those other taxes are not going to HTA today. They're going to these other public purposes. That's what I meant. So the model you have here in ordinary homeowner sense is, I borrow money from you. I give you a mortgage on my home. My Uncle Harry also promises you that he'll send me $1,000 a month so I can make sure I make payments to you. And then all of a sudden we stop paying. You've got the mortgage on my home, which would be called the segregated funds in the account, but then you've got a breach of contract action against my Uncle Harry. I think that's the model you have. Exactly right. That's exactly right. And that's what's happening. It's another unsecured claim against the Commonwealth. I still am puzzled when you say there's nothing keeping HTA from paying over those funds now. Why aren't they paying them? Well, the vast bulk of HTA funds goes to sustain the transportation system. So what about the funds in the segregated account? If there's a segregated – well, if they're not being used for any other purpose, they could go to hand-back bondholders. So why aren't they? I just don't know the reason for that. It's probably because there are mediations in place and discussions, and it's all part of one package. But, again, it's very small dollars in the picture. That's not why they're in question. But then you say there's no – what I just heard you say literally is there's no law keeping them from doing it, but they're doing it to gain leverage in negotiations, which – I wouldn't say it's to gain leverage. I'm – perhaps Mr. Friedman will answer. I mean, sort of the premise of the Commonwealth's position is that because of this dire financial crisis, funds that otherwise would go to these special accounts have got to be used for other purposes to promote the health and welfare of the Commonwealth. Are you indicating that despite that argument, that, in fact, funds from excise taxes, from toll revenues, from other types of revenue that are derived from the transportation system, that some of that money is, in fact, going into these special accounts and is simply not being paid? No, I'm not saying that at all. Are you saying you don't know at this time? No, I'm – the extent of my knowledge is that when the case started, there was some money left over in the special account, and I think it's still there. But I'm not talking about – All of the tolls go to maintain the transportation system, the roads and the train, and the extra money they used to get from Commonwealth taxes are no longer being sent to HTA because they have to go to these other expenses. Policemen, firemen, teachers, welfare, pensions, et cetera. That's what's happening. And really why the thrust of MDAC's case this morning is they want to force the Commonwealth to take those taxes it used to pay to HTA and to start doing it again so that there will be more than enough money to sustain the transportation system and their debt can be paid. And we would like to pay it and hope to someday, but right now we have to keep the Commonwealth as a going concern. So to return to my original question, you seem to be saying that 922 is simply not in play because there are no pledged special revenues available. They only meet that description if the money finds its way into these special accounts. Is that your position? Yes, I'm making that point and one additional point. If they were there, then HTA has the option because there's no language in 922 that says you must turn it over. But as you pointed out, there would likely be no reason not to turn it over if HTA had extra money. So I think what we're hearing from both sides is there's the possibility that there's some funds sitting in the segregated account. Nobody seems to be able to tell us. It's sort of nice to have a case where $60 million may be around there and people aren't sure if it's there or not. But anyhow, the big issue here is the renewal or non-renewal of the flow of funds into that account. Absolutely. And on that issue, if relief from stay were granted and if a proceeding were brought in a non-Title III court, then wouldn't the moratoria become, in the fiscal plan, become potential tools that the Commonwealth would use to resist enforcement of that contractual undertaking? By the contractual undertaking, I'm referring to the promise from my Uncle Harry type undertaking. And the answer is absolutely not for several reasons. The first reason is 303.1 by its terms says it's not binding on AMBAC as a non-consenting creditor. So nobody could use the moratorium as a defense. Reason number two is that AMBAC itself, it may disagree on this, but the money that the Commonwealth used to transfer to HTA is between the Commonwealth and HTA. AMBAC can't sue for that money. Now, they may say they can sue because they were told it would exist and they expect it. So maybe they would argue they're a third-party beneficiary. But the bottom line is if they were allowed to bring that suit, then they would have to basically convince a court, whether it's federal or a non-federal court, that the fiscal plan of the Commonwealth and the budget should not be respected and that monies that the Commonwealth really doesn't have available to pay HTA should go to HTA anyway so the police won't be paid. I mean, that's the position that they would be in. Now, I just want to point out another reason why we believe 303 really doesn't apply here is that it's very explicit, 303.1, that it makes prohibitions on payment of principal. It uses the word prohibit. Prohibit payment of principal or interest. If you go through all of the moratorium laws and the three executive orders, the first moratorium act gave the governor the power to prohibit, but he didn't use it. Instead, he said, I'm not imposing a moratorium on HTA. I am suspending its obligations. Now, it sounds technical. What's the difference between prohibit and suspend? Well, it actually has meaning. Since he said I'm suspending, they can pay, so there's no prohibition. They don't have the money to pay, so it's academic. And even without the executive order and the moratorium law, Title III wouldn't let them pay because they don't have the money. So we're sort of puzzled. Why is AMBAC doing this? And the answer we think exists because they're saying in their brief that they get a remedy that 303 doesn't provide. They say they get nullification. Well, these executive orders do all kinds of things about prioritizing payment of necessary expenses for health and safety. So they're actually asking not for the remedy 303.1 provides, which is not fighting against them. They're asking for a remedy to get rid of the order, which would undo all sorts of allocations of monies that the Commonwealth needs to continue with the bill. To some extent, your argument reduces to the proposition that what AMBAC is asking for simply cannot be so because if it is so, this whole effort at restructuring the debt of Puerto Rico so it can get out of this very difficult circumstance, it just falls apart. The implications of it from your point of view are unthinkable. It's sort of this just can't be solved because of the implications. Isn't that what you're arguing in essence? I am saying that as a fact. That's not my legal argument. My legal argument is... But that proposition seems to inform many of your legal arguments. Well, it's a fact, but for 80 years since the Chandler Act, the first reorganization act in the United States, was enacted in 1938, debtors have used their creditors collateral. Even when they lose money. Most debtors in bankruptcy are there because they've been losing money, and they don't stop losing it just because they filed bankruptcy. They've been using creditors collateral for 80 years, and in AMBAC's two briefs, you will not find one decision from a bankruptcy court in 80 years that using a collateral and losing it resulted in contracts clause or takings, claims, and damages. It just doesn't exist. Why? You pointed it out at the beginning of this session. If they're really worried about their collateral being eroded, and these collaterals are revenue streams indefinite, they can ask for stay relief, and when they do, they'll have to prove the value of those collateral streams and whether they're declining because of the stay. And maybe those are the reasons why they've chosen not to do what the other creditors have done. When you describe the moratorium laws not prohibiting HTA from making payments so that HTA could make them, are you speaking on behalf of both the board and the commonwealth, or do we have to... No, let me be very clear. I was making a technical argument that the way the executive orders are written, they don't satisfy the language in 3031 of a prohibition. But I'm saying with or without the moratorium laws, neither the board nor the board as representative of the Title III debtor would allow payments to be made for them because we don't have the money. Thank you. Thank you. Mr. Friedman? Thank you, Your Honor. I'm Peter Friedman on behalf of ACLAS and certain government defendants. I wanted to start by talking about the money in the reserve account. And it's very clear that the money in the reserve account, the reason it's not being paid out, has nothing to do with the moratorium act or Puerto Rico law. And we know that because money from the reserve account was paid out up until the date of the Title III. In fact, the moratorium act has never prevented, or the related act, has never prevented a creditor, or an AMDAC in particular, from being paid. And their complaint acknowledges that. And so I think that sort of undermines, underscores the point Mr. Benestock was making with respect to the issue here is the Title III stay. In fact, if you look at the record... But that stay doesn't apply to the application of special revenue funds. So, our assertion at the beginning of the case, and it's in the record, I believe, in the joint appendix in the letter from my colleague Suzanne Ulan, which is in the record as an attachment to the complaint, cites the automatic stay as the reason for nonpayment of the funds in the reserve. Now, we may be incorrect, and that may turn out to be inaccurate, but we certainly have never asserted that Commonwealth law prevents that payment. Now, there's a reasonable, I think, good faith reason why the money is not being paid, and that is there may well be challenges to the perfection, to AMDAC's perfection. That was an issue raised with respect to liens in respect to HTA as defenses in the Piaget case, and the unsecured creditors committee, or the Title III debtors may assert lack of perfection as a reason to not make those payments in the future. But it doesn't relate to Commonwealth law, and that's clear from the record here. And so, why shouldn't the court adjudicate in this case whether those amounts are paid? That's for 305. Because they dropped the claim. Because they left it. The plaintiffs didn't appeal that argument. They never appealed that and left it to why it fell out. So, I think that's why the court shouldn't raise it or address it. But I do think the court should not address any of the challenges to Puerto Rico law, because absent lifting the stay, there is no basis to address this. There's really a judiciability issue as to application of Puerto Rico law. And if the stay were lifted, the facts might be very different. There might be a different fiscal plan in place. The Commonwealth or HTA might have different imperatives as to what to do with money that was returned. The stay ought to be lifted. So, those are all hypotheticals that could rest on very different facts. So, there's really both an addressability issue, because we don't know what happened in that circumstance, as well as a judiciability issue, because the issue isn't really ripe for adjudication. I want to make a few other relevant points. So, there was a... Ms. Miller started her presentation by saying that we know Commonwealth law matters here because the governor has effectively reissued certain executive orders. But, again, that doesn't relate to the Title III. There's a web of Puerto Rico that exists outside the Title III context. There are debt issuers who exist outside of the Title III context, and the executive orders may apply to them, but are not the bar on payment here. Now, some of the more technical points I wanted to address. Council effectively said that you can't move money around, putting money into different accounts or not putting money into different accounts, because it's 303-1. I don't think that's right, because 303-1 relates to moratoria solely as, to the extent, they prohibit payment of principal and interest, and moving money around among different accounts doesn't relate to principal interest. Now, that might relate to the terms of an executive order under 301-3, but an executive order by itself, simply by moving money around, isn't prohibitive. The executive order has to be unlawful, and it is so. The way I see it, that's where there's an overlap between the takings clause arguments or potential contracts clause arguments, but the executive order aren't preempted simply because they have an effect or an impact on the rights of bondholders. Now, the other point I wanted to make is that I certainly mostly agree with what Council did. The Oversight Board said it. I have 100% degree that if this favor were lifted, the Commonwealth absolutely could never rely on the Moratoria Act, because I think Judge Slim is correct in their conclusion that the Moratoria Act is not, and the Fiscal Claim Compliance Act, which is really the operative law here in the executive orders, constitute statutes of law binding under 303-1. Absent any questions, that's all I have, Your Honor. Thank you. Thank you. Mr. Nisbe, good morning. Good morning, Your Honor. Look, Dave, I'm at Paul Hastings' counsel for the Unsecured Creditors Committee. We're an intervener below, and our point today is very narrow, and it touches on some of the questions that were raised, and we believe, and my apologies to Judge Arreola, because you've heard this in the assured argument in San Juan already, but our point is that, and this will go to the issue of why have they not moved to lift a stay. They have not moved to lift a stay against the Commonwealth because they are, at best, an unsecured creditor of the Commonwealth. The first question that will be asked is, what is your collateral? They have no collateral against the Commonwealth. They have no security interest or lien against the Commonwealth. That's fundamental. The law that they're relying on basically says that the Commonwealth will ensure that the taxes are covered into a special deposit in the name and for the benefit of HTA. That's not a transfer of ownership. That's not a grant of security interest. What does statutory mean? That is the fundamental problem here, and we're doing all this, carousing all this brain damage over constitutional taking, Section 407, moratorium, and I know you're going to signal to Becca that this court did not address that issue, and I know, Judge Arreola, in the pie chart you said, if the court below doesn't address an issue, generally we don't, but the court, the First Circuit has made exceptions to that when the issues are purely legal and they're clear, and here the fundamental issue is vis-a-vis the Commonwealth. Forget HTA for now. What is the relationship? Only HTA has a relationship with the Commonwealth, and that's your uncle, the example of your uncle that says, I will pay as well. There is no transfer of ownership of these taxes. There is no grant of a lien, statutory or otherwise, and that's the entire case right there, and so I would urge the court, if the court is not prepared to affirm, I'm not saying you shouldn't affirm, I think you should, but if you think you should not affirm or if you think you're amending with some directions, that that be the first issue addressed, which is vis-a-vis the Commonwealth. What is the property interest of AMAC? And the only answer we have to that, Your Honor, is a decision that Judge Ribas authored, and it's the Flores de Larsa case, and you know it very well, but it involved this fund that was created to cover insurance premiums. That case, two issues. First, before you reach the issue of the constitutional deprivation here, you have to find that this was not a public corporation, and you did find it was not a public corporation, but HGA here, which is the entity that has a connection with the Commonwealth, it is a public corporation, there's no doubt that it is, and the law is clear that if a subsidiary issue, well, HGA is created by the Commonwealth and is controlled by the Commonwealth, that entity cannot have any constitutional claims against its creator. They're not a third-party beneficiary of that undertaking. Well, that's an unsecured promise, and the reason why you found in that de Larsa case that the government had no right to hold on to it, you said, wait a minute, what is the relationship here? Yes, there's a statute that says you shall transfer, but you said the relationship here between the Commonwealth is not, the Commonwealth is not an insurer, it is not in the business of providing car insurance. It's a mere custodian. These were your words. And here, it's totally different. The Commonwealth is the only entity that can collect taxes in Puerto Rico. The Commonwealth is in the business of collecting taxes. These are its taxes, and it's not acting as a custodian. It's a mere promise, the same way they make promises to all our constituents. We will pay you, we really mean it, we will pay you, and we'll pay you by X date. And that's essentially the crux of the issue. And I would urge you to, if you have any qualms about affirming, to reach that issue because it is plainly a legal issue. There's no doubt that they cannot have a statutory lien. You held in PIA that there was no statutory lien on the tolls, so can you imagine that somehow the tolls are collected by the HCA, right? So if they don't have a statutory lien on those tolls, how could they have a statutory lien against the Commonwealth? By the way, it wouldn't be them. It would be HCA itself that would have a statutory lien against the Commonwealth. That's heresy. And can they have a consensual lien against the Commonwealth? No, there's no UCC filing. So the point is, I don't think we need to go through all this preemption, 303, 407, and all that, just basically look at the basic relationship between the parties, and that's an unsecured promise. The Commonwealth, 922 and 928, I'm going to close on that, doesn't apply. I mean, it applies in the Commonwealth case, but not as to, it's not, they're not a revenue, meaning that they don't have the secured claims against the Commonwealth. So 922 and 928 cannot apply as to them in the Commonwealth. It may apply as to them in the HCA case, but not in the Commonwealth case, and that's fundamental. And then we go back to that they need to move to lift this peg, and what's going to happen there, they have no collateral. Thank you. Thank you. Ms. Miller? Thank you. So a number of people raised the question of moving to lift the peg and moving for adequate protection, and we heard Mr. Rivas now say they didn't do what certain other creditors did here and move for adequate protection and demonstrate the value of their collateral and how the value of their collateral is being affected by the state. But, again, that argument is entirely circular because, as the CCC points out in its brief, the Commonwealth laws exist as they do today on the books, which includes the moratorium laws and the executive orders, which are diverting collateral from one instrumentality to another. So it's putting us in an impossible situation to say that the moratorium acts and the moratorium laws are not preempted, but I'm still going to have to go ahead and prove the value of my collateral, which the CCC says is zero, because we'll tell the Commonwealth law from the books. I think the way it arises, you move for stay, the other side says you're adequately secured, and you say you're not. And if in the course of that they argue one of the reasons you're adequately secured is something about the moratorium that the court needs to rule on, then it rules on them in the context of that case where it's a right issue that affects the outcome that the court is properly called upon to determine. Well, our position is that it's a right issue today because it goes to whether or not we can pursue those remedies. So I'm not sure that we need to be in the adequate protection box because we have other statewide remedies which might not be included from pursuing. I think when you move to stay, one of the things we're hearing today is the big argument you're going to run into is that with respect to all of the payments that originate with the Commonwealth, they're going to say you're either not the promissory or you're unsecured in any event. And that proceeding would provide an opportunity for you to rebut and challenge that. So I just want to make sure that we're clear that that argument that we just heard from Mr. DePant relates exclusively to the taxes and not to the toll revenues which are generated by HTA itself. And it's inconsistent with both the language of the statute, with the statute granting the toll revenues to HTA and including the limitation and the requirement that they shall be used solely for payment by HTA to its bondholders and then subsequently pledged as collateral to the bondholders in the resolution as well as in the statute. And this court's determination in Piaget that the statutory lien with respect to the toll revenues didn't consider or address any of the excise taxes. And I want to challenge Mr. DePant's suggestion that it would be anathema to common sense to suggest that the toll revenues couldn't have statutory liens but that the excise taxes would. Quite the opposite. Like the excise taxes are taxes that the Commonwealth is collecting, has allocated by statute to HTA, and has told HTA that it can use those solely as a pledge to its bondholders. It would be perfectly consistent with that construct to have the statutory grantors because the revenues aren't being generated exclusively by HTA. So I think the logic supports our position, which is that those are supported by a statutory lien. A couple of other things with respect to the toll revenues. Mr. Green has talked about how they're all being used for operating expenses. Well, there's a process for that. If they want to use toll revenues for operating expenses, they need to have those operating expenses set under 928C. There's a procedure for that. And then the court would set what amount is necessary for the particular project that is secured by the collateral, and any excess would then have to be paid to bondholders. The suggestion that the oversight board said, well, we would never stockpile money, and if there's excess, we're supposed to give it to bondholders, is not true because there is $69 million sitting in the trust account, which they just won't pay. But they're also, last year, disposed $11 billion in commonwealth accounts, including $3.8 billion of unrestricted cash as of December 31, 2018, which is growing. At the time that this case was filed, that was a little bit less than $1.5 billion. So they are stockpiling cash, which also goes to the contract claim, which we then talk about whether the broad total sweeping is necessary to address even the important public programs, which none of us dispute. Thank you. Thank you.